UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

ALZHEIMER'S FOUNDATION OF AMERICA,
INC., d/b/a ALZHEIMER'S FOUNDATION,

        Plaintiffs and
        Counterclaim Defendant,

- against -

ALZHEIMER'S DISEASE AND RELATED
DISORDERS ASSOCIATION, INC.,

        Defendant and
        Counterclaim Plaintiff.

-------------------------------------X

10 Civ. 3314 (RWS)

OPINION

A P P E A R A N C E S :



Attorneys for the Plaintiff

MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, NY 10022
By:  Martin D. Edel, Esq.
    Kerrin T. Klein, Esq.

THE INGBER LAW FIRM
374 Millburn Avenue, Suite 301
Millburn, NJ 07041
By:  Mark J. Ingber, Esq.

Attorneys for the Defendants

BAKER & MCKENZIE LLP
452 Fifth Avenue
New York, NY 10018
By:  John Basinger, Esq.
    Lisa Rosaya, Esq.
    Michael Atkins, Esq.

**Sweet, D.J.**


There are three motions pending between Plaintiff-Counterclaim Defendant Alzheimer's Foundation of America, Inc. (The "AFA") and Defendant-Counterclaim Plaintiff Alzheimer's Disease and Related Disorders Association, Inc. (The "Association").  The Association has moved for a preliminary injunction to prevent the AFA from purchasing Association-owned trademark terms from any search engine provider and from utilizing the phrases "Alzheimer's Foundation" and "an association of care and support" in its advertising.  The Association has also moved to compel the AFA to produce documents that are relevant and material to the Association's counterclaims.  The AFA, in turn, has moved to compel the production of documents relevant to the Association's claims and the AFA's defenses, and to require the Association to identify, by production number, documents that the Association asserts it has produced in response to specified requests.


Based on the conclusions set forth below, the Association's motion for a preliminary injunction is denied. Both the Association's and the AFA's motions to compel are granted in their entirety.

1

**Prior Proceedings**

**1. AFA's Claims Against The Association**

The facts and prior proceedings regarding the litigation of AFA's claims against the Association are set forth in two prior decisions and orders of this Court dated May 25, 2011 and August 29, 2014, familiarity with which is assumed. Alzheimer's Foundation of America, Inc. v. Alzheimer's Disease & Related Disorders Association, Inc., 796 F. Supp. 2d 458 (S.D.N.Y. 2011); Dkt. No. 170.  On April 7, 2014, AFA moved for reconsideration of the Court's dismissal of AFA's claims.  That motion was denied on August 22, 2014.  Alzheimer's Foundation of America, Inc. v. Alzheimer's Disease & Related Disorders Association, Inc., No. 10 Civ. 3314, 2014 WL 4290455 (S.D.N.Y. Aug. 29, 2014)

**2. The Association's Counterclaims Against AFA**

On August 22, 2011, the Association filed an answer and counterclaim in response to AFA's third amended complaint. The Association filed an amended counterclaim ("AC") on

2

September 13, 2013.


On July 15, 2014,[1] the Association moved for a preliminary injunction.  On September 4, 2014, the Association moved to compel AFA to produce documents relating to the Association's counterclaims.  These two motions were heard and marked fully submitted at the conclusion of the preliminary injunction hearing on October 1, 2014.


On November 25, 2014, the Court stayed the Association's motions for a preliminary injunction and to compel discovery until the conclusion of mediation set to begin in early 2015.  On February 10, 2015, the parties informed the Court that the mediation had concluded without resolution of the dispute and requested a lift of the stay, as well as permission to submit supplementary briefing with respect to the Association's preliminary injunction motion.


The parties each submitted supplementary memoranda regarding the preliminary injunction on February 20, 2015.

---

[1] The Association's motion was received in July but, due presumably to a clerical error, appears on the docket in late August.  (See Dkt. Nos. 183, 185.)

3

The AFA's motion to compel was filed on March 10, 2015 and was marked fully submitted on April 1, 2015.  A subsequent judicial mediation held on April 30, 2015 was unsuccessful, necessitating the resolution of the pending motions.

**Facts**

**1. The Association And Its Marks**

The Association was formed in 1980.  (Declaration of John Basinger in Support of Association's Motion for Preliminary Injunction, Dkt. No. 189 (the "Basinger Decl."), Ex. 53 ¶ 9.) Since that time, it has become the world's largest private voluntary health organization in Alzheimer's care and support, as well as the world's largest private non-profit Alzheimer's research funder.  The Association has a national office in Chicago and more than 80 local chapters across the nation providing services within each community.  (Basinger Decl. Ex. 53 ¶ 10(i)-(ii); Declaration of Angela Geiger in Support of Association's Motion for Preliminary Injunction, Dkt. No. 190 (the "Geiger Decl."), ¶ 7(a).)

The Association owns numerous marks containing the

4

term "Alzheimer's Association," chief among which is ALZHEIMER'S ASSOCIATION®, U.S. Reg. No. 2,850,223 (the "'223 Mark"), which according to its filing covers a variety of services including promoting the interests of those with neuro-degenerative brain disease, charitable fundraising, medical research, and providing information and support groups. (Basinger Decl. Ex. 31.) The Association applied for the '223 Mark on September 3, 2002 and the United States Patent and Trademark Office ("USPTO") registered it on June 8, 2004. (Id.) The Association has been using the '223 Mark and identifying itself by the two-word moniker "Alzheimer's Association" since 1988. (Id.)

The Association owns a number of other U.S. registrations for marks containing the term "Alzheimer's Association" which cover identical or closely-related services to those enumerated in U.S. Reg. 2,850,223. (See AC ¶¶ 15-16; Basinger Decl. Exs. 31-35.) The Association also owns WALK TO END ALZHEIMER'S®, U.S. Reg. No. 4,122,255, and MEMORY WALK®, U.S. Reg. No. 2,860,307 (together with the '223 Mark and WALK TO END ALZHEIMER'S®, the "Association Marks"). (See Basinger Decl. Exs. 34-35.)

In its fiscal year ending June 30, 2013, the

5

Association raised $108,946,787 in contributions and grants. (Basinger Decl. Ex. 55 at 1.)  The Association received contributions and grants of $75.8 million in 2010, $86.1 million in 2011, and $92.5 million in 2012.  (Basinger Decl. Ex. 56-58.)

The Association's MEMORY WALK® and WALK TO END ALZHEIMER'S® marks refer to an event which raises awareness and funds for Alzheimer care, support, and research.  (Geiger Decl. ¶ 7(c).)  In 2013, more than 42,000 teams participated in nearly 650 walks across the United States, raising more than $55 million.  (Id.)

The Association has used the '223 Mark, as well as other of the Association Marks, for over 25 years to promote and market its services in outlets including printed publications, various local and national TV and other media and, more recently, via its Internet website www.alz.org, in order to "build the Association's valuable reputation and increase its recognition among consumers." (Geiger Decl. ¶¶ 4-6.)  In the 2013 fiscal year, the national Association expended $87.5 million on program activities, including more than $27 million on public awareness and education.  (Geiger Decl. ¶ 6.)

6

## 2. The AFA And Its Marks

The AFA was founded in 2002 by a consortium of
organizations across the United States.  (Third Amended
Complaint, Dkt. No. 47, ¶ 10.)  In 2009, the AFA raised
$3,793,782 in contributions and grants, as compared to
$3,956,630 in 2011 and $5,566,367 in 2012.  (Basinger Decl. Exs.
40-42.)  Since its inception, the AFA has identified itself as
"Alzheimer's Foundation of America" or "AFA."  (Basinger Decl.
¶¶ 3-5, 16, Ex. 2-4, 48.)  Until 2009, AFA rarely referred to
itself as "Alzheimer's Foundation" without also using the
geographical designator "of America."  (Id.)

In 2007, the Association and the AFA engaged in litigation
in Virginia state court, of which the Court has previously taken
judicial notice, concerning which entity was the intended
beneficiary of a gift from a trust where the trustee had made a
check out to "Alzheimer's Foundation" but sent it to the
Association at the Association's Chicago address.  See
Alzheimer's, 796 F. Supp. 2d at 468-69.  In 2009, in proceedings
in connection with that litigation, the AFA learned that donors
sometimes confuse the Association's name as "Alzheimer's
Foundation" and that the Association cashes those checks when

7

sent to its address or its lockboxes.  (Third Amended Complaint,
Dkt. No. 47, ¶¶ 35-37.)  The AFA similarly received hundreds or
thousands of checks made out to "Alzheimer's Association" or
similar names.  (Basinger Decl. ¶ 17.)  The proceedings
terminated in early December 2009.  Alzheimer's, 796 F. Supp. 2d
at 469.

In late December 2009, AFA first began to register
"Alzheimer's Foundation" as an assumed name.  (Basinger Decl.
Ex. 4.)  At the same time, AFA filed for its first trademark
using the two-word moniker "Alzheimer's Foundation" without the
geographic designation "of America."  (Basinger Decl. Ex. 47.)
Up until this point, AFA had never previously registered
"Alzheimer's Foundation" as an assumed name, nor had it applied
for any trademarks using "Alzheimer's Foundation" without also
including "of America."  (See Basinger Decl. Exs. 43-46.)  In
its trademark filing, the mark disclaims any exclusive right to
"Alzheimer's Foundation" apart from the graphic mark and AFA did
not claim first use in commerce of that mark until October 2010.
(Basinger Decl. Ex. 47.)

On April 20, 2010, AFA commenced the instant lawsuit,
claiming that the Association infringed AFA's marks by cashing

checks bearing the word "Foundation" or an abbreviation in the
payee line and setting forth other causes of action.  (See
generally Complaint, Dkt. No. 1.)  Ten days later, on April 30,
2010, AFA filed an assumed name application in New York, where
AFA is headquartered, for the name "Alzheimer's Foundation."
(Basinger Decl. Ex. 4 at 15-19.)

The AFA claimed that it was entitled to "thousands of
checks" that had been sent to the Association that contained the
word "Foundation" or an abbreviation (see FAC ¶¶ 7, 53, 72) and
sought $50 million in punitive damages.  (FAC ¶ 92.)  Around the
same time, AFA was conducting internet search engine advertising
campaigns purchasing the Association's trademarked names and
events as keywords, causing its name to appear in the sponsored
ad section of internet search result pages which were generated
by user internet searches for "Alzheimer's Association," "Memory
Walk," and other Association trademark terms.  (Basinger Decl.
¶¶ 6-8.)  The AFA appears to have used its "Alzheimer's
Foundation" graphic mark only in two small advertisements that
appeared in the Fall 2010 and Spring 2011 issues of its own Care
Advantage magazine.  (Basinger Decl. ¶ 16.)

On June 17, 2014, the Association contacted the AFA, noting

that it had "recently come to [the Association's] attention"
that AFA had engaged on an online advertising campaign which
involved, among other things, the purchase from Google and other
internet search providers keywords that used the Association's
'233 Mark and other marks, in order to trigger search results
that displayed ads and text identifying the AFA as "Alzheimer's
Foundation" with the first line of body text beginning "An
Association of Care and Support."   (See Basinger Decl. Ex. 49.)
The AFA agreed to discontinue the use of the phrase
"Association" in the content of its ads, but declined to cease
the purchase of Association marks as keywords.   (Basinger Decl.
Ex. 50.)


       On July 8, 2014, counsel for the Association reviewed
the AFA's trademarks and applications through the USPTO online
trademark status and document retrieval system, as well as
appended documents, and noticed that a specimen submitted by the
AFA appeared to omit the words "of America" in a space where it
would otherwise have been visible.   At the preliminary
injunction hearing, Kristen Ann Traina, the attorney who
submitted the application on the AFA's behalf, testified that
the omission was a mistake and that she promptly corrected it
after discovery by attaching a specimen evidencing use in

commerce of "Alzheimer's Foundation" by the AFA.   (Transcript of
September 30, 2014 Preliminary Injunction Hearing, Dkt. No. 214,
at 4:19-37:12; Declaration of Mark J. Ingber in Opposition to
Motion for Preliminary Injunction, Dkt. No. 196 (the "Ingber
Decl."), ¶¶ 5-11.)

        As noted above, the Association filed for a
preliminary injunction on July 15, 2014.   Hearings on the motion
were held on September 15, September 30, and October 1, 2014,
during which both organizations put forward fact witnesses.
Over the following months, the organizations attempted to solve
their dispute via mediation, first privately and then with the
assistance of the Court.   Those efforts failed, leading to this
Opinion on the motion's merits.

**Applicable Standard**

        Preliminary injunctions are "extraordinary and drastic
remed[ies] that should not be granted unless the movant, by a
clear showing, carries the burden of persuasion."   Mazurek v.
Armstrong, 520 U.S. 968, 972 (1997).   A party seeking a
preliminary injunction must establish, in addition to a showing
of likelihood of success on the merits, that (1) "he is likely

to suffer irreparable injury in the absence of an injunction;"
(2) "remedies available at law, such as monetary damages, are
inadequate to compensate for that injury;" (3) the balance of
hardships tips in his favor; and (4) "the 'public interest would
not be disserved' by the issuance of a preliminary injunction."
Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (citing
eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006));
see also New York City Triathlon LLC v. NYC Triathlon Club,
Inc., 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010) (applying eBay
standard to trademark case).  When a party is seeking a
preliminary injunction that will alter, rather than maintain,
the status quo, it is required to show "a clear or substantial
likelihood of success," Sunward Elecs., Inc. v. McDonald, 362
F.3d 17, 24 (2d Cir. 2004).


     With respect to discovery disputes, district courts
have broad discretion in deciding motions to compel.  See Grand
Cent. P'ship. Inc. v. Cuomo, 166 F.3d 473, 488 (2d Cir. 1999).
Federal Rule of Civil Procedure 26 states:

          Parties may obtain discovery regarding any
          nonprivileged matter that is relevant to any
          party's claim or defense--including the existence,
          description, nature, custody, condition, and
          location of any documents or other tangible things
          and the identity and location of persons who know

of any discoverable matter.  For good cause, the
court may order discovery of any matter relevant
to the subject matter involved in the action.

Fed. R. Civ. P. 26.  If a party objects to discovery requests,

that party bears the burden of showing why discovery should be

denied.  Freydl v. Meringolo, No. 09 Civ. 07196 (BSJ)(KNF), 2011

WL 2566087, at *3 (S.D.N.Y. June 16, 2011).  Specifically, the

resisting party must show how, "despite the broad and liberal

construction afforded the federal discovery rules, each request

is not relevant, or how each request is overly broad,

burdensome, or oppressive, by submitting affidavits or offering

evidence revealing the nature of the burden."  Sokol v. Wyeth,

Inc., No. 07 Civ. 8442, 2008 WL 3166662, at *3 (S.D.N.Y. Aug. 4,

2008).

## I.   The Association's Motion For A Preliminary Injunction Is Denied

### a. Likelihood Of Success On The Merits

The Association has alleged claims against AFA under

Section 43(a) of the Lanham Act, which protects trademark

holders from unfair infringement.  In specific, Section 43(a)

prohibits the use in commerce of any word, term, name, symbol,

13

device, or combination thereof that:

> is likely to cause confusion, or to cause mistake,
> or to deceive as to the affiliation, connection,
> or association of such person with another person,
> or as to the origin, sponsorship, or approval of
> his or her goods, services, or commercial
> activities by another person . . . .

15 U.S.C. §§ 1125(a)(1) & (a)(1)(A).  Section 32 of the Lanham

Act provides that:

> (1) Any person who shall, without the consent of
> the registrant—
>
> (a) use in commerce any reproduction,
> counterfeit, copy, or colorable imitation of a
> registered mark in connection with the sale . . .
> of any goods or services on or in connection with
> which such use is likely to cause confusion, or to
> cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy, or colorably
> imitate a registered mark and apply such . . . to
> labels, signs, prints, packages, wrappers,
> receptacles or advertisements intended to be used
> in commerce upon or in connection with the sale .
> . . of goods or services on or in connection with
> which such use is likely to cause confusion, or to
> cause mistake, or to deceive, shall be liable in a
> civil action . . . .

15 U.S.C. § 1114.  In order to prevail in an action for

trademark infringement under Sections 32 and 43(a), a party must

establish: (1) that its mark is entitled to protection, and (2)

that the defendant's mark is likely to cause confusion as to the

14

origin or sponsorship of the product at issue.  See 15 U.S.C. §
1125(a)(1)(A); see also Rescuecom Corp. v. Google, Inc., 562
F.3d 123, 128 (2d Cir. 2009); Virgin Enters. v. Nawab, 335 F.3d
141, 146 (2d Cir. 2003).  In some fact situations, as in those
found here, the Court must also examine whether the defendant's
use of a plaintiff's mark constitutes a "use in commerce" under
the Lanham Act.  Rescuecom, 562 F.3d at 128, 130.


     With respect to the first inquiry, under 15 U.S.C. §
1057(b), a certificate of registration of a mark on the USPTO
Principal Register is prima facie evidence of the validity of
the mark and its registration, as well as the registrant's
ownership and exclusive right to use the mark in commerce.  See
Dress for Success Worldwide v. Dress 4 Success, 589 F. Supp. 2d
351, 358 (S.D.N.Y. 2008) ("A mark is presumed to merit
protection when the plaintiff has a valid registered trademark."
(citation omitted)).  The Association has represented, and the
AFA has not disputed, that the ALZHEIMER'S ASSOCIATION® mark and
the other Association Marks are registered on the Principal
Register, and that the registrations are owned by the
Association.  As such, the first prong is satisfied and the
marks are entitled to protection against infringement.

With respect to whether the AFA's purchase of the Association's Marks as keywords constitutes a "use in commerce" under the Lanham Act, the Second Circuit has definitively stated that it does.  In Rescuecom, the Court explained:

> We did not imply . . . that an alleged infringer's use of a trademark in an internal software program insulates the alleged infringer from a charge of infringement, no matter how likely the use is to cause confusion in the marketplace.  If we were to adopt Google and its *amici*'s argument, the operators of search engines would be free to use trademarks in ways designed to deceive and cause consumer confusion.  This is surely neither within the intention nor the letter of the Lanham Act.

Rescuecom, 562 F.3d at 130.  Moreover, in a recent decision in this Circuit, the Honorable Gabriel W. Gorenstein found no "meaningful difference" between a search engine's act of selling to an advertiser and the advertiser's action in purchasing the benefit from the use of a trademark.  LBF Travel, Inc. v. Fareportal, Inc., No. 13 CIV. 9143 LAK GWG, 2014 WL 5671853, at *7 (S.D.N.Y. Nov. 5, 2014).  Judge Gorenstein wrote that both the search engine and the advertiser "have 'used' the trademark in the same way by engaging in a commercial transaction — the search engine as the seller and the advertiser as the purchaser — to produce a display of search result advertisements that derives from the use of a trademark."  Id.

16

Although the AFA's purchase of the Association's trademarks in search engine advertising does qualify as use in commerce, using another company's trademark in commerce is not in itself a violation of the Lanham Act. See Rescuecom, 562 F.3d at 130 ("Needless to say, a defendant must do more than use another's mark in commerce to violate the Lanham Act. The gist of a Lanham Act violation is an unauthorized use, which is likely to cause confusion . . . ." (internal quotations omitted)). Companies can and do regularly purchase other companies' marks as search keywords and use those companies' trademarks in the text of their search advertising in order to draw a contrast with the searched-for product and offer their own as an alternative. For instance, a Yahoo! search for the term "Honda Civic" brings up ads linking to websites from Hyundai, Volkswagen, and Toyota, comparing the Civic to their cars and suggesting that the consumer purchase an Elantra, Jetta, or Corolla instead. Although such advertisements use trademarked terms in commerce and are geared toward increasing the ad buyer's business at the trademark holder's expense, they do not implicate the Lanham Act because they draw a clear distinction between the products and do not imply the trademark holder's sponsorship or approval. While use of a trademark in commerce

17

is a key element of a Lanham Act violation, a defendant is only liable "when a trademark holder can establish that the use of its trademark by another is likely to confuse consumers as to the source of the product." Home Box Office, Inc. v. Showtime/The Movie Channel Inc., 832 F.2d 1311, 1314 (2d Cir. 1987). Put simply, the AFA's purchase of the Association's trademarks only violates the Act if the advertisements are likely to cause confusion.

Federal courts determine whether a mark is likely to cause confusion in the marketplace based on an assessment of various points of consideration, commonly referred to as the Polaroid factors. These factors include: (i) the strength of the plaintiff's mark, (ii) the degree of similarity between the competing marks, (iii) the proximity of the products, (iv) the likelihood that the prior owner "will bridge the gap," (v) actual confusion, (vi) defendant's good faith, (vii) the quality of defendant's product, and (viii) the sophistication of the consumers. Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961); see also Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 411 (S.D.N.Y. 2006). Although the Second Circuit has not yet explicitly adopted an approach for determining the issue of consumer

18

confusion when a competitor uses a trademark to purchase keywords, the majority of courts at the district level appear to apply the Polaroid factors or their Circuit's equivalent.  See CJ Prods. LLC v. Snuggly Plushez LLC, 809 F. Supp. 2d 127, 158-59 (E.D.N.Y. 2011).  In principal, the Court "must focus on the ultimate question of whether consumers are likely to be confused."  Merck, 425 F. Supp. 2d at 411.

i.  Strength Of The Mark

"The strength of a trademark is assessed with reference to its distinctiveness," Pretty Girl, Inc. v. Pretty Girl Fashions, 778 F. Supp. 2d 261, 267 (E.D.N.Y. 2011), and registered marks enjoy "a conclusive presumption of distinctiveness." Savin Corp. v. Savin Grp., 391 F.3d 439, 457 (2d Cir. 2004).  Additionally, "[u]nder the Lanham Act, when a registered mark has been in continuous use for five consecutive years it becomes incontestable," Dress for Success, 589 F. Supp. 2d at 358 (quotation omitted).  The ALZHEIMER'S ASSOCIATION® mark has been used since 1988 and has been registered with the USPTO since June 2004.  (Basinger Decl. Ex. 31.)  The WALK TO END ALZHEIMER'S® and MEMORY WALK® marks are both registered and have been continuously used by the Association for over five

consecutive years.  (Basinger Decl. Exs. 31-35.)  As such, the
first Polaroid factor weighs strongly in the Association's
favor.


        ii.   Similarity Of Marks


        In the search engine keyword context, the Court's inquiry
must differ slightly from the typical application of second
Polaroid factor.  In examining the similarity of the marks, the
Court must consider the similarity between a plaintiff's service
mark and the defendant's advertisements appearing on the search-
results page.  CJ Prods., 809 F. Supp. 2d at 159 (citing 1-800
Contacts, Inc. v. Lens.com, Inc., 755 F. Supp. 2d 1151, 1175 (D.
Utah 2010)).  The Association has submitted numerous search
engine screen shots that display ads for AFA resulting from a
search of the term "Alzheimer's Association."  In the "organic,"
meaning non-paid-for, search results, AFA's website appears as
"Alzheimer's Foundation of America."  By contrast, in the paid
ad resulting from a search of the term "Alzheimer's Association"
the AFA's website is marketed with the two-word moniker
"Alzheimer's Foundation."  The website URLs are also very
similar – www.alz.org versus www.alzfdn.org.  While the websites
are not similar in appearance, as has been the case in other

20

litigation, see, e.g., CJ Prods., 809 F. Supp. 2d at 159, AFA's
ad has a strongly similar aesthetic to that of the Association's
organic search engine listing, which appears to be purposeful,
given the fact that AFA's organic search engine listing still as
of February 2015 refers to AFA by its full name: Alzheimer's
Foundation of America.  (See Ass'n Suppl. Mem. at 4.)


### iii.   Competitive Proximity


This factor turns on "whether the products are in
competition with each other in the marketplace." CJ Prods., 809
F. Supp. 2d at 154 (citing Cadbury Beverages, Inc. v. Cott
Corp., 73 F.3d 474, 480 (2d Cir. 1996)).  Although the
Association and AFA perform different functions and focus on
different areas of advocacy - AFA focuses on aid to caregivers
while the Association focuses on research as well as direct
services (AFA Suppl. Mem. at 2) - both organizations are
charities serving a donor community with an interest in
Alzheimer's disease.  As such, they can be said to be in direct
competition and this factor favors the plaintiff's likelihood of
success on the merits.


### iv.   "Bridging The Gap"

21

"This factor concerns the likelihood that a plaintiff that is not in direct competition with the defendant at the time a suit is brought will later expand the scope of its business so as to enter the defendant's market." Pretty Girl, 778 F. Supp. 2d at 268.  This factor is not relevant in the instant case as the parties appear to operate in the same market.

v.   Actual Confusion

Generally speaking, "a likelihood of confusion is actionable even absent evidence of actual confusion," 1-800 Contacts, Inc. v. WhenU.com, 309 F. Supp. 2d 467, 491 (S.D.N.Y. 2003), rev'd on other grounds, 414 F.3d 400 (2d Cir. 2005), since "actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source" Lexington Mgmt. Corp. v. Lexington Capital Partners, 10 F. Supp. 2d 271, 287 (S.D.N.Y. 1998).

As an initial matter, the AFA has previously conceded that actual confusion exists between the terms "Alzheimer's Association" and "Alzheimer's Foundation."  In its Second

Amended Complaint, the AFA alleged that the similarity between its trademarks and those of the Association, combined with the Association's actions in accepting checks made out to the Alzheimer's Foundation, "have resulted in a likelihood of confusion in commerce, whereby numerous ordinary prudent donors have been, and are likely to be, misled into believing that the Association and the Foundation are the same organization." (Second Amended Complaint, Dkt. No. 40, ¶ 60.)  Such statements made in earlier pleadings can be considered against the parties who filed them.  See U.S. v. McKeon, 738 F.2d 26, 31 (2d Cir. 1984).  Additionally, the parties point out that checks intended for the AFA or Alzheimer's Foundation are received by the Association (First Amended Complaint, Dkt. No. 13, ¶¶ 49-53) and that checks intended for the Association are received by the AFA (Basinger Decl., ¶17).  The scale of the confusion is unclear, however; although the Association argues that documents produced by the AFA show that "hundreds or thousands of checks" intended for the Association were ultimately received by the AFA (Id.), the Association did not include any portion of the documents in its papers or introduce them at the preliminary injunction hearing.  It is thus difficult for the Court to determine if the actual confusion is significant or de minimis.  Cf. Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 115, 124

23

(2d Cir. 2001).

The Association has also been unable to demonstrate significant actual confusion as a result of the AFA's internet advertising practices, or any intentional deception.  Unlike in other cases such as CJ Products, where parties provided evidence such as a review of website visitor data or customer reviews complaining of confusion in the competing websites and products, the Association has failed to causally link AFA's purchase of Association trademark terms and use of a two-word designation with actual consumer confusion.

The evidence offered by the Association of actual confusion from the AFA's internet advertising is scant at best.  In its briefing, the Association points to a declaration from Meika Slotsema, its Estates and Trusts lawyer, stating that she received phone calls from an accountant in Chicago who intended to direct funds to the Association on behalf of a deceased client, but was confused by AFA's presence on internet search results.  (Affidavit of Meika Slotsema, Dkt. No. 187, ¶¶ 3-4.) Ms. Slotsema also testified at the preliminary injunction hearing, estimating that she received similar calls "a couple of times a week," and that some of those calls came from persons

24

confused by internet searches.  (Hearing transcript, Dkt. No.
214, at 41, 52.)  However, inquiries about the relationship
between an owner of a mark and an alleged infringer do not
amount to actual confusion.  <u>Nora Beverages</u>, 269 F.3d at 124.
In fact, they arguably demonstrate a lack of confusion because
the consumer was put on sufficient notice to ask the question.
<u>Id.</u>

   The Association also puts forward a declaration by Brigitte
Lee, an administrative assistant at the Association, who had a
family friend who clicked on the AFA's link while Ms. Lee was
attempting to direct her to the Association's website,
www.alz.org, for information about Alzheimer's disease.
(Declaration of Brigitte Lee, Dkt. No. 188, ¶ 2.)  Christine
Foh, the Association's general counsel, testified at the hearing
regarding an incident where an obituary was published requesting
donations to the Association, prompting mourners to send in a
number of checks accompanied by forms that had been downloaded
from the AFA's website.  When Ms. Foh called up one of the
donors to ask why the AFA's form accompanied her donation, the
donor replied, "I typed your name in the search bar and I
clicked on the first name that came up and I downloaded the form
and filled it out."  (Hearing Transcript, Dkt. No. 212, at 18-

20.   Ms. Foh testified that similar incidents happen "on a regular basis."  (Id. at 20.)

The evidence of actual confusion offered by the Association amounts to a small handful of anecdotes, accompanied by assertions that they are representative of a larger number of incidents.  This showing is insufficient to establish the presence of actual confusion, particularly when weighed against the nearly $100 million in successful donations that the Association receives annually (Geiger Decl., Docket No. 190, ¶8).  See Nora Beverages, 269 F.3d at 124; C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 F.2d 14, 18 (2d Cir. 1985); Real News Project, Inc. v. Independent World Television, Inc., No. 06 Civ. 4322, 2008 WL 2229830, at *17-18 (Lynch, J.).

In the website context, courts have applied the doctrine of initial interest confusion, "which posits that a likelihood of confusion can arise when 'a consumer who searches for the plaintiff's website with the aid of a search engine is directed instead to the defendant's site because of a similarity in the parties' website address.'"  CJ Prods. 809 F. Supp. 2d at 160 (quoting Savin, 391 F.3d at 462 n. 13.).  Even if the customer

26

quickly becomes aware of the competing source's actual identity
and can rectify the mistake, the damage to the first user may
already have been done.  See BigStar Entmn't, Inc. v. Next Big
Star, Inc., 105 F. Supp. 2d 185, 207 (S.D.N.Y. 2000).  However,
because consumers who are diverted on the Internet can more
readily get back on track if they notice a discrepancy, the
initial interest doctrine generally requires "a showing of
intentional deception."  Savin, 391 F.3d at 462 n. 13.

     The Association has not solidly established
intentional deception for the purposes of the initial interest
doctrine.  Unlike in CJ Products, where the defendants both
employed a color and format on their copycat website
substantially similar to that of the plaintiff's and prominently
featured the plaintiff's trademark, the AFA's website is
distinct from the Association's in both content and
presentation.  The Association has alleged bad faith on the part
of the AFA, both in asserting that the AFA purposely began using
the two-word designation "Alzheimer's Foundation" in
anticipation of litigation with the Association and in asserting
that the AFA made a false representation to the USPTO regarding
its use of the two-word designation.  (Ass'n Mem. 6; Ass'n
Suppl. Mem. 2-3.)  Such practices are placed in sharp relief

when reviewing over four years of litigation by AFA in which the
primary complaint was confusion between the two charitable
organizations.  However, while intentional deception might be
implied, it is not firmly enough established to demand the
determination that this critical factor weighs in the
Association's favor.

In sum, although some amount of actual confusion from the
two-word designation has been conceded by the AFA, the
Association has not established at this point that the scale of
that confusion is significant.  It has also failed to establish
any actual confusion stemming from the AFA's internet search
engine advertising practices, or to show the intentional
deception needed to prevail under the initial interest doctrine.

### vi.   AFA's Good Faith

As noted above, the Association has put forward a
suspicious, though inconclusive, timeline of AFA's use of the
two-word designation "Alzheimer's Foundation" as evidence of bad
faith.  The timeline laid out by the Association, taken with the
AFA's selective, advertising-only use of two-word moniker
"Alzheimer's Foundation," is certainly dubious.  While bad faith

28

may not be sufficiently established for purposes of the initial interest doctrine, it can be said to weigh at least somewhat in the Association's favor in the Polaroid analysis.

### vii.   Quality Of AFA's Product

The Association has made no serious argument against the quality of the AFA's efforts against Alzheimer's Disease, choosing instead to merely affirm the quality of its own.  (See Ass'n Mem. 17).  Thus, this factor weighs somewhat in the AFA's favor, although the quality of a defendant's product is less important in determining customer confusion at the preliminary injunction stage.  CJ Prods., 809 F. Supp. 2d at 156.

### viii.   Sophistication Of The Consumer

"This factor examines the extent to which a buyer evaluates a product before purchase." Id. at 155.  It is assumed that highly trained professionals are less likely to be misled, while ordinary consumers are not assumed to exercise the same level of care as professional, trained buyers.  See Kraft Gen. Foods, Inc. v. Allied Old English, Inc., 831 F. Supp. 123, 133 (S.D.N.Y. 1993); Pretty Girl, 778 F. Supp. 2d at 268-70.

It is difficult, as the Association admits (see Ass'n
Mem. 17), to broadly characterize the sophistication of
consumers in this case, the donors or potential donors to
Alzheimer's charities and consumers of Alzheimer's support
services.  However, common sense dictates that a large number of
donors are ordinary citizens seeking to give money to
Alzheimer's-related research because Alzheimer's has somehow
touched their lives, or are friends or family members seeking
help dealing with a loved one's condition.  Some consumers may
even have diminished capacity as they struggle with the early
stages of the disease.  Furthermore, there is a long history of
litigation over checks made out to an incorrect payee in the
instant case.  As such, this factor can be said to weigh in
favor of the Association.

### ix.   Conclusion

Taken together, most factors are either neutral or
weigh in the Association's favor, although the weakness of its
case for actual confusion casts some doubt the strength of the
evidence it will ultimately put forward.  Since the Association
is seeking an injunction that will alter, rather than maintain,
the status quo, it is required to show "a clear or substantial

likelihood of success," Sunward Elecs., Inc. v. McDonald, 362
F.3d 17, 24 (2d Cir. 2004), a higher showing than the likelihood
of success on the merits required under the traditional
preliminary injunction standard.  While the Association's case
is persuasive, and there is a real possibility that it will
prevail on its claims, at this stage it has not made a showing
sufficient to meet this bar.

### b. Irreparable Harm

"Irreparable harm exists in a trademark case when the party
seeking the injunction shows that it will lose control over the
reputation of its trademark pending trial because loss of
control over one's reputation is neither calculable nor
precisely compensable."  N.Y. City Triathlon, LLC v. NYC
Triathlon Club, Inc., 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010)
(citation omitted).  In cases like the one here, "damage to [a
plaintiff's] goodwill and reputation cannot be quantified, as it
is unknown how many potential customers plaintiffs will lose
from their loss of reputation and goodwill due to consumers
confusing their products with defendant's products."  CJ Prods.,
809 F. Supp. 2d at 156; see also Pretty Girl, 778 F. Supp. 2d at
270-71.  However, conclusory statements of loss of reputation

will not justify an irreparable harm finding.  See N.F.L.
Players Ass'n v. N.F.L. Props., Inc., No. 90 Civ. 4244 (MJL),
1991 WL 79325, at *4 (S.D.N.Y. May 7, 1991).

As noted above, the Association has not adequately
demonstrated actual confusion between the two charities as a
result of the purchase of its trademark terms and use of the
two-word designation "Alzheimer's Foundation" in web
advertising.  Nor has the Association shown irreparable harm
from the Foundation's use of the word "association" in
advertising which, as of the time that the preliminary
injunction was filed, AFA represented it had discontinued.  (See
Declaration of Bert E. Brodsky, Dkt. No. 193, ¶¶ 24-26.)  The
Association's claim for irreparable harm is further undercut by
its impressive growth in revenue over the past few years.  (See
Ass'n Mem. 4; Geiger Decl. ¶ 8, Exs. 55-58.)

Additionally, "[s]ignificant delay in applying for
injunctive relief in a trademark case tends to neutralize any
presumption that infringement alone will cause irreparable harm
pending trial, and such delay alone may justify denial of a
preliminary injunction for trademark infringement."  Citibank,
N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985).  Any

32

presumption of irreparable harm "is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." Marcy Playground, Inc. v. Capitol Records, Inc., 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998).  In this case, the Association has known of the AFA's use of the two-word designation "Alzheimer's Foundation" since at least 2010.  (See generally AC; Ass'n Mem. at 7.)  It also, due to discovery in this case, has apparently known since at least 2012 that AFA was purchasing Association trademark keywords from search engines. (Ingber Decl. ¶¶ 13-15.)  Although what appears to have sparked the Association to action was a new AFA advertising campaign which displayed ads, triggered by searches for the Association's Marks, which included the language "An Association of Care and Support," the AFA has discontinued that language, and the remaining behavior complained of has been known to the Association for years.

"Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  Delay in seeking enforcement of these rights, however, tends to indicate at least a reduced need for such drastic, speedy action.  While delay does not always undermine an alleged need for preliminary relief, months-long

33

delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief." Silber v. Barbara's Bakery, Inc., 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (quotation omitted).  Given the years that have passed since the Association became aware of the AFA's use of the two-word designation and its subsequent search engine advertising campaigns, as well as the Association's tremendous growth in donation revenue during that time, its application for a preliminary injunction is entirely lacking in urgency.

### c. Absence Of Remedies At Law

Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law generally cannot adequately compensate a trademark plaintiff for its injuries. See Mrs. U.S. Nat'l Pageant, Inc. v. Miss U.S. Org., LLC, 875 F. Supp. 2d 211, 231 (W.D.N.Y. 2012) (citing Koon Chun Hing Kee Soy & Sauce Factory Ltd. v. Kun Fung USA Trading Co. Inc., No. 07-CV-2568, 2012 WL 1414872, at *5 (E.D.N.Y. Jan. 20, 2012)).  If the Association ultimately succeeds in proving that AFA's actions have infringed on its trademarks and damaged its brand, it will be difficult to put a dollar value on the

34

damage, leaving it without an adequate remedy at law.


### d. The Balance Of Hardships


In deciding a preliminary injunction motion, a court "must balance the competing claims of injury and consider the effect of granting or withholding the requested relief." Winter v. N.R.D.C., 555 U.S. 7, 24 (2008). A preliminary injunction may not issue unless the movant clearly shows that the balance of equities is in its favor. Litwin v. OceanFreight, Inc., 865 F. Supp. 2d 385, 401 (S.D.N.Y. 2011).

The parties devote little attention to this issue in their briefing. The Association argues that AFA's continued use of the term "Alzheimer's Foundation" and purchase internet advertising related to the Association will harm the Association's brand in ways that "likely cannot be undone." (Ass'n Mem. at 21.) The Foundation makes a similar argument, declaring that if it were to stop referring to itself by the two-word name or cease purchasing its targeted keywords, it would suffer "fundamental changes to [its] marketing and recognition among donors." (AFA Mem. at 24.)

The AFA has the better of the arguments, but only marginally. Since the purchase of targeted keywords is

invisible to the consumer and the AFA could achieve somewhat similar search results without purchasing the Association's marks as keywords, it is difficult to say that the AFA would suffer significant hardship if it were forced to discontinue purchasing those specific keywords. The question of the damage to the parties' brands caused by the use of the term "Alzheimer's Foundation" is a closer one. The hardship that the Association would suffer from the AFA's continued use of the term between now and trial is more speculative, particularly given the lack of clear evidence of significant confusion among donors and the Association's impressive fundraising growth in the last few years. (See Geiger Decl. Ex. 56-58 ll. 8.)

### e. The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). This case presents a unique set of circumstances where the public interest is harmed not by the conduct of one party or another, but by continuation of the litigation itself. The parties in this case are two legitimate and respected

36

charities working to combat a cruel disease that robs its victims of their cognitive ability and sense of self.  Their work is both admirable and desperately needed, yet in this litigation they are spending immense financial resources in order to gain an entirely speculative edge in fundraising.  This serves neither their constituencies' interests nor that of the public at large.

But for the parties' intransigence and inability to find common ground, resources expended on discovery, summary judgment motions, trial, and appeals would be directed toward providing care and support to people suffering from Alzheimer's Disease, or toward research that might make progress on finding a cure. The expense is particularly frustrating because the applicable law provides an outline for how the parties can peacefully coexist.  Since the use of another company's trademark in commerce does not offend the Lanham Act absent consumer confusion, see Rescuecom, 562 F.3d at 130, and the Association does not contend that the terms "Alzheimer's Federation of America" or "AFA" cause confusion (See Ass'n Mem. at 5-7, 22), it takes little imagination to arrive at an outcome where the AFA can continue its online outreach without engaging in conduct the Association would view as confusing the public.  Regardless of the merits of the parties' claims, therefore, to the extent

37

that issuance of a preliminary injunction might push them to resolve their dispute now rather than litigate further, the public interest weighs in favor of granting the Association's motion.  See John M. Newman, Raising the Bar and the Public Interest: On Restraints, "Traditional Contours," and Constitutionalizing Preliminary Injunctions in Copyright Law, 10 Va. Sports & Ent. L.J. 323, 327 (Spring 2011) ("The enormous power of injunctive relief . . . frequently forces preliminarily enjoined defendants to negotiate settlements—even where they might have raised a meritorious defense at trial.").

### f. Conclusion

The Association has failed to clearly establish the three most important factors in the preliminary injunction analysis: a likelihood of success on the merits, the prospect of irreparable harm, and the balance of the hardships tipping in its favor. Though the Association makes strong points on several of the Polaroid factors, its case for confusion falls short of the "clear or substantial likelihood of success" required for a preliminary injunction that would alter the status quo.  See Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24-25 (2d Cir. 2004).  The Association also fails to adequately establish

38

irreparable harm, and its argument on that point is fatally
undermined by its delay in seeking relief.  See Citibank, N.A.
v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985).  The balance of
hardships also tips slightly in favor of the AFA.  The motion
for a preliminary injunction is therefore declined.


**II.   The Association's Motion To Compel Is Granted**


The Association separately moves to compel production of
several categories of documents that relate to the AFA's
internet advertising campaign and the decisionmaking process
behind it.  In specific, the Association seeks 1) documents
showing all of the AFA's purchases of internet search keywords
since 2010; 2) documents showing what advertising text was used
with each set of keywords; 3) documents concerning the AFA's
decision to purchase the Association's trademarks as keywords;
4) documents concerning the AFA's decision to refer to itself as
the "Alzheimer's Foundation"; 5) documents concerning the AFA's
decision to use the phrase "an association of care and support"
in advertising; and 6) documents concerning the expected return
on investment for purchases of various keywords.  As the party
resisting discovery, the AFA must show how, "despite the broad

39

and liberal construction afforded the federal discovery rules, each request is not relevant or how each request is overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence revealing the nature of the burden." Sokol v. Wyeth, Inc., No. 07 CIV. 8442, 2008 WL 3166662, at *3 (S.D.N.Y. Aug. 4, 2008).

The AFA first argues that documents regarding its keyword advertising practices are irrelevant because purchasing keywords does not amount to use in commerce under the Lanham Act.  This argument fails for the reasons stated in section I(a), supra. Next, the AFA argues that keyword-related advertising is irrelevant because keywords cannot create consumer confusion. The AFA notes that the keywords purchased by an advertiser are not visible to consumers and argues that they simply place the AFA's ads in a search result list, meaning that "[i]nternet users are no more likely to confuse the Foundation with the Association than they are to confuse a branded product in the drug store aisle with its unbranded equivalent that appears in the same aisle."  (AFA Mem. in Opposition to Motion to Compel, Dkt. No. 208, at 7.)  The Second Circuit rejected this argument in Rescuecom, noting that the product placement argument is not "a magic shield against liability;" rather, the placement of

40

generic drugs does not offend the Lanham Act because they are clearly labelled differently from the branded options, rendering their placement "a benign practice which does not cause a likelihood of consumer confusion." 562 F.3d at 130.  If two products are intentionally placed next to each other for the purpose of causing confusion (as the Association alleges the AFA to have done), the Second Circuit writes that "we see no reason to believe the practice would escape liability merely because it could claim the mantle of 'product placement.'"  Id.  And in any event, the standard for relevance in discovery is much lower than the standard for liability.  Even if the AFA's "product placement" argument were valid, a decision to deliberately place AFA's ads next to the Association's search results would be relevant to the questions of competitive proximity and good faith, key factors in the Polaroid analysis.

Thirdly, the AFA contends that its keyword practices are not relevant to the issue of willfulness and damages, since purchasing keywords is a "legitimate business practice."  (AFA Mem. in Opposition to Motion to Compel, Dkt. No. 208, at 8.)  On the contrary, the standard for willfulness is "whether the defendant had knowledge that his conduct represented infringement or perhaps recklessly disregarded the possibility."

41

Nike, Inc. v. Top Brand Co., Ltd., No. 00 Civ. 8179, 2005 WL
1654859, at *6 (brackets and quotation marks omitted)(quoting
Kepner-Treqoe, Inc. v. Vroom, 186 F.3d 283, 288 (2d Cir. 1999)).
To the extent that documents concerning the AFA's keyword buying
practices might show a deliberate intent to muddy the waters,
they may be relevant to the willfulness issue.

     Lastly, the AFA argues that the discovery sought by the
Association is unduly burdensome. It writes that granting the
motion to compel will "force the Foundation to produce extensive
documents concerning its internal purchases, and detailed and
proprietary marketing information about its costs, revenues, and
traffic." (Pl.'s Mem. of Law in Opposition to Motion to Compel,
Dkt. No. 208, at 8.) This assertion, without more, is
insufficient. The AFA offers no affidavits or other evidence
regarding the scale of the effort necessary to comply with the
Association's document requests, or why doing so would be beyond
the AFA's capabilities. As the party resisting discovery, that
showing was its burden.

     The Association's motion to compel is granted.

## III.    AFA's Motion To Compel Is Also Granted

42

The AFA has filed a motion to compel of its own, seeking documents that it deems relevant to the Association's claims of harm, the existence of confusion, the Association's good faith, and the Association's claims of damages.  The AFA argues that the Association has refused to produce documents in response to two sets of requests, one from 2012 and the other from 2014. This opinion will deal with each set of requests in turn.  On each request the Association, as the party resisting discovery, has the burden of demonstrating why the documents requested are irrelevant or unduly burdensome.  See Sokol, 2008 WL 3166662 at *3.

### a. 2012 Discovery, Request 30

This request concerns allegations made in the Association's original set of counterclaims that the AFA's former CEO, Eric Hall, took photographs of slides created by the Association at a conference in Paris in violation of that conference's rules. (Association's Answer, Dkt. No. 48, ¶¶ 14-48.)  The Association notes that it has removed those allegations from its amended counterclaims and argues that the documents are therefore not relevant.  Leaving aside the fact that the AFA served its 2012 discovery requests many months before the Association amended

43

its counterclaims in September 2013, a pleading that has
subsequently been amended is not entirely dead letter.  It can
be used to impeach or undermine the credibility of the party
that filed it, as the AFA says it intends to do here.  See
Andrews v. Metro N. Commuter R. Co., 882 F.2d 705, 707 (2d Cir.
1989).  The AFA is entitled to this discovery.


### b. 2012 Discovery, Request 45


This request covers "documents concerning the goodwill
attached to the use of [the Association's] marks, including any
documents upon which [the Association] may rely."  The parties
later agreed to narrow the request's scope to a representative
set of documents, rather than all documents potentially
relevant.  (Edel Dec., Dkt. No. 227-1, at 9.)  The dispute here
regards which documents produced by the Association actually
concern this request.  The Association claims that its
representative documents include advertisements, Forms 990,
pledge cards, and "other documents produced, among others," a
phrase that the AFA correctly points out is vague to the point
of incomprehensibility.  The Association has not specifically
indicated which of its documents were responsive to Request 45,

44

making it difficult for the AFA to know just which documents the Association views as representative.

The AFA argues that it is entitled to all documents on which the Association may rely; the Association says it currently intends to rely only on the representative documents it has produced, although it has not designated which documents those are and may decide to rely on additional documents later, (in which case it promises to produce them).  The AFA replies that this arrangement leaves the contents of the "representative" sample unclear and allows the Association to withhold important documents now and produce them only when it decides to rely on them later.

The manner in which documents are produced is governed by Rule 34, which provides in relevant part that a party "must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request."  Fed. R. Civ. P. 34(b)(2)(E)(i). Representative samples of documents that a party intends to rely on to prove a claim in litigation are by definition not kept in the usual course of business, but rather generated as part of

45

the discovery process.  Therefore, by Rule 34's terms, the
representative documents that comprise the Association's
response to Request 45 must be labelled as such.  As to the
Association's suggestion that it may decide to rely on documents
outside its production and turn them over to the AFA later, the
agreement between the parties to produce "representative
documents concerning goodwill . . . including any documents upon
which [they] may rely" (Edel Dec. Ex. 1, Dkt. No. 227-1, at 9)
does not allow such wiggle room.


### c. 2012 Discovery, Requests 57 and 58


These requests concern all non-privileged studies, surveys,
searches, and/or questionnaires regarding the Association's
marks and all related nonprivileged documents.  According to the
AFA, the Association's production did not include any studies,
searches, or questionnaires, although a February 24, 2015 letter
from the Association's counsel indicated that such documents
existed (Edel Dec. Ex. 5, Dkt. No. 227-5, at 3).  In its
opposition, the Association writes that it "represented to AFA
that survey results that have been identified will be produced.
Expert discovery has not yet begun, and any expert reports and

46

accompanying documents will be produced according to the schedule for expert discovery."

Although expert discovery may bring additional disclosure obligations in the future, it is not relevant to the Association's current duty to disclose. Any surveys, searches, studies or questionnaires responsive to Requests 57 and 58, along with any nonprivileged documents that relate to them, must be turned over now, not later.

### d. 2012 Discovery, Requests 69 and 70

These requests seek any documents the Association intends to use as evidence that the AFA misrepresented its identity or appropriated the Association's goodwill. The Association raises four arguments against disclosure – first, that the AFA did not take issue with these requests at a February 2015 meet-and-confer session; second, that the Association has produced responsive documents; third, that it has no obligation to identify the types of documents responsive to the requests; and fourth, that it does not need to produce documents because the AFA has not produced documents that the Association deems material to the issue. The first and fourth arguments are

easily dismissed.  The AFA's failure to raise the issue in 2015 does not relieve the Association from a duty to disclose that arose in 2012, nor does the AFA's failure to produce documents relieve the Association of its own discovery responsibilities.

As to the production and identification of documents, the AFA's request to have the Association identify which documents are responsive to Requests 69 and 70 is a reasonable one, particularly since the Association argues in its brief that the documents are easily searchable and that the documents it intends to use are "self-evident."  To the extent that the Association intends to introduce any documents on these subjects that it has not yet turned over, they must be disclosed now.

### e. 2012 Discovery, Request 71

Through this request, the AFA seeks documents relating to the Association's alleged damages stemming from use of its marks.  The Association argues that the motion should be denied because it has produced responsive documents and "has identified the nature of the documents produced that it regards as bearing most closely on injury and damages."  (Association Mem. In Opposition to Motion to Compel, Dkt. No. 228, at 7.)  The AFA

points out that the Association admits it has only turned over
"representative" documents and indicated broad categories of
documents that might be relevant.  While the parties agreed that
Request 45 would be satisfied by production of a representative
sample of documents, no such agreement took place here.  The
Association must turn over all documents relating to damages and
identify them as such.

### f. 2014 Discovery, Request 85

This request seeks information on the search engine
advertising keywords purchased by the Association and the amount
of money the Association spent on each purchase.  The
Association argues that this data is only relevant to a
potential unclean hands defense from the AFA.  The Association
asserts that an unclean hands defense would not apply because it
is only viable where the misconduct alleged in the defense has
an "immediate and necessary relation" to the equity the
plaintiff (or in this case, counterclaim plaintiff) is seeking,
Specialty Minerals, Inc. v. Pluess-Staufer AG, 395 F. Supp. 2d
109, 112 (S.D.N.Y. 2005), and that relation is not present

because it is uncontested that the Association has not purchased the AFA's marks as search engine advertising keywords.

Leaving aside the merits of any unclean hands defense on the part of the AFA, the discovery sought is appropriate because it is also relevant to the question of confusion under Polaroid. Evidence of the keywords purchased by the Association and the amounts spent on them would help to demonstrate where the Association's own advertisements appeared. It is at least arguable that a consumer is less likely to be confused when the Association and the AFA both have ads at the top of his or her search results, as compared to a situation where the AFA's advertisement stands alone. Since the placement of the Association's advertisements is relevant to a claim or defense, the Association must fully respond to Request 85.

### g. 2014 Discovery, Requests 86 and 87

These requests seek information about and court filings from all other lawsuits the Association has filed alleging trademark infringement, as well as any filings or motions by the Association concerning trademark applications at the U.S. Patent and Trademark Office. The Association argues that this

discovery is unwarranted because it could only be relevant to the defense of abandonment, which the AFA has failed to plead. The AFA responds that "failure to police its marks against similarly situated entities negates [the Association's] claims of irreparable harm, confusion, and damages" and shows "that the Association is acting in bad faith in singling out AFA for legal action." (AFA's Reply Mem. in Support of Motion to Compel, Dkt. No. 229, at 7.) While federal courts differ on the proposition, at least some courts have found that a party's failure to prosecute third-party infringers can negate the presence of irreparable harm. See, e.g., Warner Lambert Co. v. McCrory's Corp., 718 F. Supp. 389, 393-94 (D.N.J. 1989); Parfums Stern, Inc. v. U.S. Customs Serv., 575 F. Supp. 416, 420 (S.D. Fla. 1983); but see Ortho Pharm. Corp. v. Cosprophar, Inc., 828 F. Supp. 1114, 1123 (S.D.N.Y. 1993).

Although the connection between this case and the Association's trademark litigation history is tenuous, "the Rule 26(b)(1) standard presents a relatively low threshold for a party to show that the material sought is relevant." John Wiley & Sons, Inc. v. Book Dog Books, LLC, 298 F.R.D. 184, 186 (S.D.N.Y. 2014). The Association must turn over the requested information about its trademark enforcement activity, whether in

51

court or at the USPTO, to the extent that any such activity
exists.


### h. 2014 Discovery, Requests 88 and 89


These requests seek documents concerning any people the
Association claims were confused by the AFA's search engine
advertisements, and any instances of confusion between the
Association's marks and those of the AFA.  The Association
contends that it has conducted a reasonable search and produced
documents concerning instances of confusion discussed in three
declarations it has filed in this case, but it objects to
producing all documents regarding all persons that it claims
were confused because it has no way of knowing the identity of
every single person on the internet who has been confused by the
AFA's ads.  (Association Mem. in Opposition to Motion to Compel,
Dkt. No. 228, at 9.)  However, the Association's inability to
ascertain the identity of every person who was confused by the
advertisements does not release it from its obligation to
produce documents in its possession concerning all persons of
whose confusion it is aware.

### i. 2014 Discovery, Requests 91, 92 and 94

These requests seek documents pertaining to any other entities referring to themselves as "Alzheimer's Association" or "Association" in internet advertising, communications between the Association and such entities, and communications between the Association and internet search providers about other entities' purchase of keywords.  The Association argues that the discovery is irrelevant for the same reason as Requests 86 and 87.  However, discovery is proper here for the same reason as it was on those requests: because information about the Association's efforts to protect its marks from infringement by third parties is at least potentially relevant to the existence of irreparable harm or confusion.  The Association is ordered to produce these documents.

### j. 2014 Discovery, Request 96

This request seeks "[d]ocuments sufficient to show, by month and year, the number of donor checks that the Association received from 2007 to the present and the amount thereof." According to the AFA, this data helps to show that any confusion created by the use of the term "Alzheimer's Association" and the

AFA's internet advertising campaign is *de minimis*.   The Association contends in its brief that its systems are not set up to record this information and that it has already provided the AFA with access to electronic records from which it can determine the information on its own.   The AFA denies that it has been given access to such information.


    Given the Association's significant year-over-year expansion in revenue (See Ass'n Mem. 4; Geiger Decl. ¶ 8, Exs. 55-58.), it seems likely that any signal showing a negative effect caused by the AFA's practices will be drowned out by the noise of the Association's general growth.   Unfortunately, the merits of the Association's undue burden argument are impossible to evaluate because it has not introduced any affidavits or other evidence supporting it.   See Sokol, 2008 WL 3166662 at *3. As the party resisting discovery, that showing was the Association's burden.   The Association must comply with the request.


        **k. 2014 Discovery, Request 97**

54

This request seeks documents concerning each item of damages claimed by the Association, including a computation of each category of damage alleged.  The Association argues that the request is premature and that "documents to support the Association's damages claims will be provided prior to trial or as otherwise ordered by the Court."  (Association Mem. in Opposition to Motion to Compel, Dkt. No. 228, at 12.)  Its brief provides no support for the proposition that such documents should be produced prior to trial rather than when requested in discovery.  The Association also argues that this discovery is not warranted because the AFA is withholding damages-related documentation of its own.  Discovery-related misconduct by one party does not excuse the other party from its disclosure obligations, and in any event the Association's motion to compel the disclosure of those documents was granted in Section II, supra.  The AFA's motion for production of these documents is granted.

Conclusion
_____

        Based upon the facts and conclusions of law set forth

above, the Association's motion for a preliminary injunction is

denied.  Both the Association's and the AFA's motions to compel

are granted in their entirety.


        It is so ordered.



New York, NY
June 26, 2015

                                        _____
                                        ROBERT W. SWEET
                                           U.S.D.J.